**UNITED STATES of America**

v.

**James J. MAHONEY.**

**Crim. No. 79–223.**

United States District Court,
E. D. Pennsylvania.

Feb. 18, 1981.

Louis J. Ruch, Robert L. Hickok, Asst. U. S. Attys., Philadelphia, Pa., for plaintiff.

John Rogers Carroll, Thomas Colas Carroll, Philadelphia, Pa., for defendant.

## MEMORANDUM

JOSEPH S. LORD, III, Chief Judge.

Defendant has moved to dismiss the superseding indictment in this mail fraud case on the basis of claimed grand jury abuse. He is charged with thirty-eight counts of mail fraud, 18 U.S.C. § 1341; seven counts of making false statements to a federal agency, 18 U.S.C. §§ 1001 & 1002; and two counts of subscribing false tax returns, 26 U.S.C. § 7206(1). For the reasons which follow, I have denied the motion.

Two grand juries heard evidence in this case. The first grand jury heard testimony and subpoenaed documents without returning an indictment. The second grand jury, impaneled June 29, 1979, returned the original indictment on October 5, 1979, and a superseding indictment on November 30, 1979.

### I. Summaries

The first grand jury heard live testimony of twenty-seven witnesses. The second (indicting) grand jury had presented to it the following: (1) the live testimony in conventional question and answer form of two people, both of fairly minor importance;[1] (2) a third witness, Lloyd Brooker, appeared in person but simply read a summary of the statement he had given to the FBI; (3) the statements of twenty-one individuals presented by FBI Agent James Carlisle, who, for each person, summarized the person's testimony given before the first grand jury and/or any statements that he or she had given to FBI investigators.[2] Defendant argues that this method of presenting evidence to the grand jury, and the prosecu-

---

1. The prosecutor himself referred to the third witness who testified after these first two as the first witness of any substance. Grand Jury Transcript Sept. 7, 1979, Comments of Ruch at 2.

2. In addition Paul S. Deery, Special Agent, Internal Revenue Service, appeared before the grand jury and described his investigation of defendant's tax returns.

torial editing of evidence which it included, deprived him of his right to an unbiased grand jury.

The Government stated that the summaries were used as a matter of economy. The United States Attorney estimated that presenting live testimony might have taken six months while, with the summary technique, the evidence was presented over three or four sessions within one month. The Government argues that the grand jury heard sufficient evidence to establish probable cause to indict the defendant, and thus the defendant was not prejudiced by this method of presenting the case to the grand jury.

Defendant is accused of having used his position of Treasurer of the Council for Revitalization of Employment and Industry in Philadelphia (CREIP) to obtain kickbacks of money, services, and goods from contractors hired by CREIP to renovate the Wissahickon Industrial Center (WIC). His major complaint about the summaries is that all statements which exculpated him and many statements which impeached those persons who incriminated him were omitted. He stresses the omission of information relating to the independent motives of Lloyd Brooker, another CREIP employee, to obtain kickbacks and pad WIC bills.[3] The grand jury did have some access to this information since Brooker appeared in person before them, read a summary of his own statement, and was available for questioning. Grand Jury Transcript, Sept. 7, 1979, Testimony of Brooker. The defendant also argues that in one instance the testifying agent changed the meaning of the testimony of a witness.[4]

The purpose of the grand jury is to determine probable cause to indict, not to determine guilt beyond a reasonable doubt. Defendant concedes that the grand jury heard enough evidence to find probable cause to indict him. Although total failure by a prosecutor to present substantial exculpatory evidence to a grand jury may constitute fundamental unfairness,[5] several courts have held that the grand jury is not required to hear exculpatory evidence as long as sufficient evidence is presented to establish probable cause to indict. *See, e. g., United States v. Lasky*, 600 F.2d 765 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979); *United States v. Ruyle*, 524 F.2d 1133 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976); *United States v. Gardner*, 516 F.2d 334 (7th Cir.), *cert. denied*, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975); *United States v. Addonizio*, 313 F.Supp. 486 (D.N.J.1970), *aff'd*, 451 F.2d 49 (3d Cir.), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

It is constitutionally permissible for a grand jury to hear evidence that would be inadmissible at trial because of its hearsay character or because it was obtained in violation of the fourth amendment. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Evidence presented to the grand jury is not subject to the same limits on admissibility as that presented at trial. Instead, the grand jury is to sift through all the evidence in order to determine independently whether probable cause exists to return an indictment or even whether a crime has been committed.

---

**3.** Information about the independent scheme of Eugene Watts, a WIC contractor, to generate cash, was also omitted.

**4.** The witness had said that he gave Mahoney $4,000 for a car because he "assumed that's what Mahoney was hinting at". The agent's summary said "Mahoney hinted around for a while" and the witness then said he would give him the money for the car. Grand Jury Transcript, Sept. 21, 1979, Testimony of Carlisle at 26.

**5.** "[W]here a prosecutor is aware of any substantial evidence negating guilt he should in the interest of justice, make it known to the grand jury, at least where it might reasonably be expected to lead the jury not to indict." *United States v. Weingartner*, 485 F.Supp. 1167, 1176 (D.N.J.1979), *quoting United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979).

*Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

Because of the great latitude allowed a grand jury in carrying out its work and the absence of admissibility limitations on evidence which it may hear, I do not think it is appropriate to establish a per se rule barring the use of summaries in grand jury presentations in all cases. I do not find that the specific summaries used here unfairly prejudiced the defendant.

 Defendant argues that the pattern of omissions of exculpatory evidence from the summaries and the misrepresentation of the testimony about the car constitute prosecutorial misconduct beyond "an isolated incident unmotivated by sinister ends." *United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979). Such serious misconduct may warrant dismissal of an indictment in the exercise of a court's supervisory powers even where abundant competent evidence supports the indictment. *Id.*

The misconduct in *Serubo* was " 'improper, reprehensible, and unacceptable.' " *Id.* at 814. It included questions, without any evidentiary foundation, about witnesses' knowledge of irrelevant and highly prejudicial murder threats. The misconduct ·alleged here does not compare in gravity. The reference to the car, *see* n.4 *supra*, was the only actual "misstatement" out of twenty-one summaries.

As noted above, the prosecutor in most cases has little or no obligation to present exculpatory evidence to the grand jury. Thus the omission of evidence about Brooker's and Watt's independent schemes, which possibly exculpated defendant in part, cannot be deemed a "flagrant abuse" of any prosecutorial responsibility. *Id.* at 817.

Although I do not dismiss this indictment, I do note that the arguments against the use of summaries are powerful and have persuaded several courts to condemn the

technique. *See, e. g., United States v. Braniff Airways, Inc.*, 428 F.Supp. 579 (W.D.Tex.1977); [6] *In re May 1972 San Antonio Grand Jury*, 366 F.Supp. 522 (W.D. Tex.1973); *In re Banana Industry*, 214 F.Supp. 856 (D.Md.1963). Total reliance on the use of summaries for prosecutorial convenience is inconsistent with the historic purpose of the grand jury which is to function as an independent body of accusers, representative of the community, and to protect individuals from arbitrary and unfounded criminal prosecutions. *Calandra*, 414 U.S. at 343, 94 S.Ct. at 617. It is designed to stand as a shield between the cumulative might of the sovereign and the individual citizen. The use of summaries instead of available live witnesses undercuts this theoretical independence of the grand jury, the reality of which has been seriously questioned. Reliance on summaries strengthens the argument that the grand jury has become little more than an extension of the prosecutor making whatever determinations he requests.[7]

The use of summaries highlights the extent of the government's control over the grand jury and the potential for abuse by prosecutorial manipulation. The use of summaries allows the government to present evidence which "appears smooth, well integrated and consistent in all respects .... [G]rand jurors do not hear cases with the rough edges that result from the often halting, inconsistent and incomplete testimony of honest observers of events." *United States v. Arcuri*, 282 F.Supp. 347, 349 (E.D.N.Y.), *aff'd*, 405 F.2d 691 (2d Cir. 1968).

As I noted in my earlier opinion in this case, *United States v. Mahoney*, 495 F.Supp. 1270 (E.D.Pa.1980), it is beyond cavil that economy is deemed a virtue in American life as well as in jurisprudence. Economy, however, does not justify the fashioning of shortcuts in criminal prosecution at the ex-

---

6. *But see United States v. Brown*, 574 F.2d 1274 (5th Cir. 1978).

7. Arenella, *Reforming the Federal Grand· Jury and the State Preliminary Hearing to Prevent Conviction without Adjudication*, 78 Mich.L.

Rev. 463 (1980); Boudin, *The Federal Grand Jury*, 61 Geo.L.J. 1 (1972); Comment, *Federal Grand Jury Investigation of Political Dissidents*, 7 Harv. C.R.–C.L. L.Rev. 432 (1972).

pense of the rights of defendants. *See United States v. Alessandrello*, 637 F.2d 131 (3d Cir. 1980) (Higginbotham, J., dissenting). The Government offered no reason for the use of summaries in this case other than convenience. It apparently could have presented live witnesses, or failing that, entire transcripts of the witnesses' testimony before the first grand jury or complete copies of the FBI interview of the witness. However, the summaries here were not gross distortions of the summarized evidence. The exculpatory character of the evidence omitted is not entirely clear. Because enough evidence was brought out for the grand jury to find probable cause to indict Mahoney, I have denied the defendant's motion.

### II. Estepa—Wander Claim

Defendant also argues that the summary of Todd McCabe's statement suffered from a specific and fatal flaw—it failed the three-part test for acceptable hearsay evidence set forth in *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972) and adopted, in dicta, by the Third Circuit in *United States v. Wander*, 601 F.2d 1251 (3d Cir. 1979). Defendant argues that the false statement counts (Counts 39–45) were based primarily on the flawed McCabe summary and therefore must be dismissed.

■ *Wander* used the Fifth Circuit's formulation of the *Estepa* rule:

> [A]n indictment based on hearsay is invalid where (1) non-hearsay evidence is readily available; (2) the grand jury is misled into believing it was hearing direct testimony rather than hearsay; and (3) there is a high probability that had the grand jury heard the eye witness it would not have indicted.

*United States v. Wander*, 601 F.2d 1251, 1260 (3d Cir. 1979), *quoting United States v. Cruz*, 478 F.2d 408, 410 (5th Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973). Defendant has not shown that the summary violated the last two parts of the test.

The grand jury was aware that Agent Carlisle was summarizing a statement given to him by McCabe—they were not led to believe that Carlisle was giving his own personal knowledge of the McCabe-Mahoney relationship. In contrast, the testifying agent in *Estepa* deceived the grand jury by testifying as if he had been an eyewitness to the events he described. The *Estepa* prosecutor "did nothing to alert the grand jury to any limitations on [the agent's] knowledge." *Id.* at 1134–35.

I do not find there was a high probability that the defendant would not have been indicted on Counts 39–45 if the grand jury had heard McCabe in person. Defendant stresses that Carlisle's summary omitted McCabe's statement that someone named Weber actually directed him to falsify his time sheets.[8] There is sufficient evidence in the McCabe summary and that of Roy Andrussier, vice-president of Altman Carpentry, Inc., that defendant knew of the work McCabe did at defendant's house, and knew that the arrangement would result in false statements about McCabe's work on his time sheets. McCabe's appearance in person before the grand jury would not have deprived them of this evidence. Therefore I have denied defendant's motion to dismiss on the basis of *Estepa-Wander* violations.

---

**8.** Counts 39–45 charge defendant with wilfully causing agents of Altman Carpentry, Inc. (McCabe's employer) to make false statements about material facts within the jurisdiction of a U.S. agency. Specifically it is charged that defendant caused Altman Carpentry, Inc.'s books to state that McCabe was working on an Economic Development Administration Project at times when he in fact was doing work on defendant's house. The charges cover the week ending July 7, 1977 through August 12, 1977, and CREIP's final request for payment from EDA on or about December 13, 1977.