269 N.J. Super. 86 (1993)
634 A.2d 576
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALFRED SMITH, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 8, 1993.
Decided December 14, 1993.
*88 Before Judges BAIME, CONLEY and VILLANUEVA.
Zulima Farber, Public Defender, attorney for appellant (Leon Symister, Designated Counsel, of counsel and on the brief).
Fred DeVesa, Acting Attorney General, attorney for respondent (Marcy H. Geraci, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
Following a jury trial, defendant was convicted of first-degree armed robbery, contrary to N.J.S.A. 2C:15-1 (count one); third-degree possession of a weapon for unlawful purposes, contrary to N.J.S.A. 2C:39-4(d) (count two), and fourth-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(d) (count three). Counts two and three were merged with count one; defendant was sentenced to a twenty-year custodial term with a ten-year parole disqualifier. A $90 Violent Crimes Compensation Board penalty was also imposed. Defendant appeals, we affirm.
The convictions were based upon the following evidence. On January 23, 1990, Shawn Shivers was working alone as a station attendant at a Jersey City Mobil gas station. When he accumulated one hundred dollars from gas sales, he would temporarily close the gas pumps so that he could deposit the money in a safe located inside the attendant's booth. The lights inside the attendant's *89 booth were turned off, however, the lights over the gas pumps lit the interior of the booth. At approximately 10:00 p.m., while the gas pumps were temporarily shut down, Shivers was approached by two men while he was inside the booth talking on the telephone. Shivers noted that one of the men was short and fat while the other man was tall and skinny. The men asked to purchase gas and cigarettes. As Shivers opened the door to hand the men the cigarettes, the men rushed into the booth. The fat man pretended to have a gun while the skinny man attempted to open the safe. When the fat man realized that Shivers had keys to the safe on a chain around his neck, he grabbed the keys, and switched places with the skinny man, attempting to open the safe with the keys. Shivers viewed the skinny man's face when he walked behind Shivers and held a knife to his neck. The knife was distinctive  its handle was wrapped in cowhide with strings criss-crossing the handle. When the men could not open the safe and became agitated, Shivers offered the men one hundred dollars from his coat pocket. They took the money and left. Shivers called the police and gave them a description of the men.
In the meantime, Officer Arthur Teeter and his partner Officer Michael Baycezk were patrolling the area. When they observed a person, later determined to be Henry Nunez, chasing after two other individuals, they immediately made a U-turn so they could catch up with the runners. When they caught up with Nunez, he told the officers that he had driven into the gas station at the time of the robbery and observed the robbery. When Nunez saw the men leave the attendant's booth and run down the street, he began chasing them. During the chase, the fat man fell down and the skinny man bent over to pick him up. At that time, Nunez observed the skinny man's face.
After Nunez related the events to the officers, he gave them a description of the men. The officers radioed those descriptions into police headquarters and resumed their chase. During the chase, the officers recovered a blue jacket one of the men had been wearing during the robbery.
*90 Officers William Moore and Todd Burke, also on patrol in the area, were advised of the robbery and given descriptions of the alleged perpetrators by the police radio dispatcher. As they were driving, they observed a man walking down the street matching the description of one of the alleged perpetrators. They stopped and questioned the man, and, after a struggle, arrested him. The officers recovered a knife and $100.00 dollars from his jacket. Thereafter, they returned to the Mobil station where Shivers recognized the face of the man and identified him as the skinny perpetrator. Shivers further identified the knife found in the man's possession as the knife held to his neck during the robbery. Nunez also identified the man as one of the perpetrators. Further, Nunez identified the blue jacket recovered by Teeter and Baycezk as the same jacket the man was wearing during the chase. The man was later identified as defendant.
At trial defendant denied any participation in the robbery. He testified that he left his workplace and began drinking at 4:00 p.m. on the day of the robbery. From there he said he went to his sister's apartment where he remained for several hours, aside from leaving temporarily to purchase more alcohol and pick up a female friend. When he returned to the apartment, he got into a fight with his brother-in-law who refused to give him more money for alcohol. Thereafter, his sister and brother-in-law threw him out of the apartment. Defendant testified that after he was kicked out of the apartment, he began walking towards his niece's house. It was at that point in time that he was apprehended by the police.
The defense provided three witnesses corroborating defendant's story. Jaliyl-As Sadiq testified that he was the superintendent of the building where defendant's sister lived. Sadiq verified that defendant was loud and abusive on the evening of January 23, 1990, and that defendant was escorted out of the building by two security guards. Salaam Hakim, one of the security guards, testified that he spent approximately twenty-five minutes attempting to remove defendant from the building. Hakim further testified *91 that defendant was extremely drunk. Defendant's brother-in-law, Alonzo Allen verified that defendant came to the apartment on the night of January 23, 1992. He also testified that he observed the police chasing someone, but, at that time, defendant was still in his apartment.
Prior to trial and at the time of the grand jury proceeding, defense counsel had provided the prosecutor with three statements from these witnesses. However, although they were essentially consistent with the trial testimony and tended to place defendant in an intoxicated state and at some other location, none of the statements related to the time of the robbery. The first statement accounted for defendant's whereabouts from 7:30 p.m. to 9:00 p.m., or one and one-half hours before the robbery. The second statement had no time frame and the third statement dealt with defendant's whereabouts from 6:00 p.m. to 7:30 p.m. Defendant's motion to dismiss the indictment based on the prosecutor's failure to present these statements to the grand jury as exculpatory evidence, was denied.
On appeal, defendant contends:
POINT I: THE INDICTMENT SHOULD HAVE BEEN DISMISSED FOR FAILURE OF THE PROSECUTOR TO PRESENT EXCULPATORY EVIDENCE TO THE GRAND JURY.
POINT II: THE OUT-OF-COURT IDENTIFICATION WAS UNDULY SUGGESTIVE (Not Raised Below).
POINT III: THE MOTION FOR A JUDGMENT OF ACQUITTAL WAS IMPROPERLY DENIED.
POINT IV: OTHER ERRORS AT TRIAL REQUIRE REVERSAL OF THE CONVICTION.
POINT V: THE SENTENCE IMPOSED WAS EXCESSIVE AS THE TRIAL COURT FAILED TO APPLY THE SENTENCING GUIDELINES.
Our review of the arguments, briefs, transcripts and applicable law convinces us that, with the exception of point I, all of the defendant's contentions are clearly without merit. As to point I, although we do not think the trial judge erred in denying the motion to dismiss the indictment, we address our concern over the State's position that a prosecutor has no duty to present exculpatory evidence to a grand jury for, as we have recently observed, *92 "the grand jury is not the prosecutor's playtoy." State v. Engel, 249 N.J. Super. 336, 359, 592 A.2d 572 (App.Div. 1991). We hold the prosecutor does have an obligation to present to the grand jury evidence in his or her possession that clearly negates a defendant's guilt.
We recognize that a prosecutor enjoys broad discretion in presenting a matter to the grand jury and, thus, a presumption of validity attaches to these proceedings. State v. Perry, 124 N.J. 128, 167-68, 590 A.2d 624 (1991); State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 18-19, 472 A.2d 1050 (1984); State v. Engel, 249 N.J. Super. at 359-60, 592 A.2d 572. Unless the grand jury's fair and impartial decision-making process has been affected by the prosecutor's conduct during the proceedings, courts will not interfere with the results. State v. Laws, 262 N.J. Super. 551, 562, 621 A.2d 526 (App.Div.), certif. denied, 134 N.J. 475, 634 A.2d 523 (1993). See In re Tuso, 73 N.J. 575, 580, 376 A.2d 895 (1977) ("[a] court may not hamstring a prosecuting official in his marshalling of evidence before a grand jury on any fine-spun distinctions between what evidence is sufficient to return a valid indictment and what is necessary to convict.").
But the exercise of discretion requires "conscientious judgment, not arbitrary action." State v. Shiren, 9 N.J. 445, 452, 88 A.2d 601 (1952). See In re Investigation Regarding Ringwood Fact Finding Comm., 65 N.J. 512, 516, 324 A.2d 1 (1974); State v. Winne, 12 N.J. 152, 172-73, 96 A.2d 63 (1953). A prosecutor, moreover, has an obligation to exercise his or her discretion in good faith, State v. Perry, 124 N.J. at 167, 590 A.2d 624, cf. State v. Murphy, 110 N.J. 20, 36, 538 A.2d 1235 (1988), and, critically, with cognizance that a primary function as a State's attorney "`is not to convict, but to see that justice is done.'" State v. Farrell, 61 N.J. 99, 104, 293 A.2d 176 (1972) (citation omitted); see RPC 3.8, 3.3.
Moreover, in presenting a matter to the grand jury, the role of that body must as well guide the responsibilities of the prosecutor. Preliminarily, we observe that the "almost mythical stature" accorded *93 the grand jury by Judge Learned Hand in In re Kittle, 180 F. 946, 947 (S.D.N.Y. 1910) (the grand jury is "what the Grand Assize originally was, and what the petit jury has ceased to be, an irresponsible utterance of the community at large, answerable only to the general body of citizens, from whom they come at random...."), has been rejected by our Supreme Court. State v. Murphy, 110 N.J. at 30, 36, 538 A.2d 1235.
In New Jersey, operating as a separate, but integral part of our jurisprudence, and drawing its authority from our Constitution, N.J. Const. (1947) Art. I, par. 8, as well as from the legislature, N.J.S.A. 2A:69-1 to 73B-3, the grand jury acts as an accusative rather than an adjudicative body, United States v. Calandra, 414 U.S. 338, 342, 94 S.Ct. 613, 617 38 L.Ed.2d 561, 568 (1974), and determines whether probable cause exists to bring a criminal charge, Branzburg v. Hayes, 408 U.S. 665, 686-87, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972). It thus serves as a sword so that those who are suspected of violating our criminal laws may be properly brought to trial. But just as importantly, the grand jury also serves as a shield to protect innocent people from arbitrary, capricious or unfounded prosecution. State v. LeFurge, 101 N.J. 404, 418, 502 A.2d 35 (1986); State v. Porro, 152 N.J. Super. 179, 184, 377 A.2d 909 (App.Div. 1977), appeal dismissed, 77 N.J. 504, 391 A.2d 517, cert. denied, 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978); State v. Smith, et al., 102 N.J. Super. 325, 340, 246 A.2d 35 (Law Div. 1968), aff'd, 55 N.J. 476, 262 A.2d 868, cert. denied, 400 U.S. 949, 91 S.Ct. 232, 27 L.Ed.2d 256 (1970). Cf. State v. Murphy, 110 N.J. at 29, 538 A.2d 1235; State v. Doliner, 96 N.J. 236, 250, 475 A.2d 552 (1984).
The prosecutor's obligation to exercise his discretion in good faith, must ensure, then, that the grand jury is able to fulfill both functions. We think it plain that this responsibility must encompass the obligation to give the grand jury evidence in the prosecutor's possession which clearly exculpates a defendant, that is, evidence that directly negates a defendant's guilt. In this respect we agree with the result and rationale expressed in State *94 v. Gaughran, 260 N.J. Super. 283, 287, 615 A.2d 1293 (Law Div. 1992). See also State v. Perry, 124 N.J. at 169, 590 A.2d 624. See generally, LaFave & Israel, 2 Criminal Procedure, § 15.4(d) (1991); R. Fischer, "The Supreme Court of the United States has (Believe It or Not) Sanctioned The Deliberate Concealment From Grand Jury by the Justice Department of `Substantial Exculpatory Evidence' Actually Known to Prosecutor", 36 Trial Law.Guide 298 (1992); Office of the Attorney General, "Grand Jury Manual for Prosecutors: Criminal Justice Standards", 5 Crim.Justice Q. 18, 20 (1977); David S. Baime & Daniel L. Grossman, "Altering the Role of the Grand Jury: Prosecution by Information and the Grand Jury's Residual Function", 4 Crim.Justice Q. 47, pp. 68-9 (1976).
The federal circuits and state courts differ as to the extent of a prosecutor's duty to present exculpatory evidence to the grand jury. The Supreme Court of the United States recently resolved the split between the federal circuits in United States v. Williams, 504 U.S. ___, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). In Williams, a federal grand jury indicted defendant on seven counts of making false statements to banks to secure loan approvals. Defendant moved to dismiss the indictment arguing that prosecutors did not tell the grand jury about certain records that, in his view, demonstrated that he lacked criminal intent because he thought that his statements to the bank were true. The district court and the Court of Appeals for the Tenth Circuit dismissed the indictment. On a 5-4 vote, the Supreme Court reversed, holding that federal courts have no authority to prescribe a rule requiring the prosecutor to disclose exculpatory evidence to a grand jury. In doing so, the Supreme Court viewed the grand jury's function as independent and separate from the federal courts, "over whose functioning the courts do not preside," 504 U.S. at ___, 112 S.Ct. at 1742, and noted its reluctance to "involve the judicial supervision power as a basis for prescribing modes of grand jury procedures," 504 U.S. at ___, 112 S.Ct. at 1743.
*95 In contrast, our Supreme Court has rejected a view of the grand jury as "something of a hidden and unsleeping and omnipotent eye watching the doing of men" with "their evocation secret and irrevocable." State v. Murphy, 110 N.J. at 30, 538 A.2d 1235. In doing so it has recognized the need to exercise supervisory authority over the grand jury to ensure a fair and unbiased proceeding and that the prosecutor has a similar responsibility. Murphy, 110 N.J. at 33, 538 A.2d 1235. And we have not been reluctant to dismiss indictments where the prosecutor clearly infringes upon the grand jury's decision-making function. See State v. Hart, 139 N.J. Super. 565, 354 A.2d 679 (App.Div. 1976).
Moreover, we observe that the alleged exculpatory evidence in Williams was not evidence that clearly negated defendant's guilt. In this respect, we consider the debate as to what type of exculpatory evidence a prosecutor should be obligated to present to the grand jury. See generally, LaFave & Israel, 2 Criminal Procedure, § 15.4(d) (1991). In California, courts have held that the prosecutor should disclose to the grand jury any evidence which will reasonably tend to negate guilt. Johnson v. Superior Court, 15 Cal.3d 248, 250, 539 P.2d 792, 794, 124 Cal. Rptr. 32, 33 (1975).
Similarly, the ABA Standards for Criminal Justice § 3-3.6 (1986) provides in part:
(a) A prosecutor should present to the grand jury only evidence which the prosecutor believes would be admissible at trial. However, in appropriate cases, the prosecutor may present witnesses to summarize admissible evidence available to the prosecutor which the prosecutor believes he or she will be able to present at trial.
(b) No prosecutor should knowingly fail to disclose to the grand jury evidence which will tend substantially to negate guilt.
(c) A prosecutor should recommend that the grand jury not indict if it is believed the evidence presented does not warrant an indictment under governing law....

[ABA Standards for Criminal Justice, § 3-3.6 (1986)].
Some jurisdictions reject the California-ABA standard as too broad. See State v. Bell, 60 Haw. 241, 247, 589 P.2d 517, 521 (1978) (prosecutor not required to disclose personal alibi testimony *96 to the grand jury, but need only disclose clear and convincing exculpatory evidence); Commonwealth v. LaVelle, 414 Mass. 146, 150, 605 N.E.2d 852, 855 (1993) (prosecutor need not reveal perjured police officer testimony to the grand jury but must only disclose evidence greatly undermining the credibility of the evidence and affecting the grand jury's decision to indict); People v. Curry, 153 Misc.2d 61, 64, 579 N.Y.S.2d 1000, 1002 (N.Y. Sup. Ct. 1992) (prosecutor must present to grand jury facts known to him which would "wholly exculpate" a defendant). Cf. Buzbee v. Donnelly, 96 N.M. 692, 701, 634 P.2d 1244, 1253 (1981). In this respect, LaFave & Israel comments:
Four considerations applicable to the grand jury are said to justify a narrower standard. First, the prosecutor at this stage of the proceedings ordinarily does not have the advantage of defense motions identifying those items that the defense views as potentially exculpatory. It would impose an intolerable burden on the government to require it to "sift through all the evidence to find statements or documents that might be exculpatory." Second, at this preliminary stage of the proceeding, where both the possible charges and defenses may be uncertain, the prosecutor (and reviewing court) is likely to have greater difficulty in determining what evidence is exculpatory. Third, consideration must be given to the "unique role of ... grand jury [review] as a flexible and non-adversarial process." It is a basic premise of grand jury screening that the "prosecutor does not have a duty to present defendant's version of the facts." Finally ... courts stress the need to avoid "convert[ing] a grand jury proceeding from an investigative one to a mini-trial on the merits."
[LaFave & Israel, supra at 318 (citations and footnotes omitted)].
Standards more narrow than the ABA-Johnson standard of "reasonably tending to negate guilt" include exculpatory evidence which clearly negates the target's guilt, State v. Bell, 589 P.2d at 520, "substantial evidence negating guilt" which "might reasonably be expected to lead the jury not to indict," United States v. Ciambrone, 601 F.2d 616, 623 (2nd Cir.1979), or whether the non-disclosure impaired the integrity of the grand jury, Commonwealth v. McJunkin, 11 Mass. App. Ct. 609, 612, 418 N.E.2d 1259, 1262 (Mass. App. Ct. 1981), or resulted in "fundamental unfairness," United States v. Mahoney, 508 F. Supp. 263, 265 (E.D.Pa. 1981).
But as observed in LaFave & Israel, "cases are fairly consistent in the illustrations they offer as to categories of evidence which must be disclosed and which need not be disclosed. This suggests *97 that the varying standards are not viewed as terms of art, but rather as indications of a general policy limiting dismissals for non-disclosure to exceptional cases":
Initially, the courts agree that the prosecutor need not disclose evidence that simply challenges the credibility of the government's witnesses. They also agree that the prosecutor need not introduce evidence which might suggest that it is less likely that the defendant committed the crime, but would not directly negate his guilt. The prosecutor's disclosure obligation is limited to evidence which, if believed, would establish in itself that he had not committed the crime  such as a confession by another to the crime or evidence that "the accused was nowhere near the scene of the crime when it occurred." Even then, consideration will be given to the likely reliability of the non-disclosed evidence. In particular, self-serving statements of the defendant, where contradicted by the prosecutor's evidence, need not be presented even though they directly negate guilt.
[LaFave & Israel, supra at 319 (footnotes and citations omitted)].
We are inclined to agree with the concerns expressed over the somewhat amorphous ABA/Johnson standard of "reasonably tending to exculpate." Rather we think a standard of "clearly exculpatory" or which "directly negates guilt" would fairly serve to ensure the grand jury's proper functioning as a shield as well as a sword, and would, at the same time recognize the substantial discretion accorded a prosecutor. We agree that a more lenient standard could transform the grand jury "from an accusatory to an adjudicatory body." U.S. v. Williams, 504 U.S. at ___, 112 S.Ct. at 1744, 118 L.Ed.2d at 368. But we think the grand jury cannot function as a shield if the prosecutor does not present evidence that clearly negates the guilt of a defendant. See State v. Gaughran, 260 N.J. Super. at 290, 615 A.2d 1293 (objective medical evidence that alleged rape by defendant did not occur). Cf. State v. Perry, 124 N.J. at 168, 590 A.2d 624.
We need not, however, delineate the precise scope of a prosecutor's obligation to present to the grand jury evidence in his possession that exculpates a defendant. What we do decide is that a prosecutor does have such an obligation. But here no matter what standard is applied, the three statements defendant argues should have been presented simply did not negate guilt. At best they put him at a different location and intoxicated some one and one-half hours before the robbery. That evidence would not have *98 led the grand jury to believe an innocent person was being accused.
Affirmed.